Good morning, Your Honors. May it please the Court, William King, on behalf of the appellants. I'd like to reserve three minutes. Your Honors, this appeal derives from the District Court's dismissal of plaintiffs' claims brought under Arizona's Securities Act. Those claims plausibly alleged two primary theories of recovery. First, and with respect to their claims under Section 44-1991A2, which I'll refer to as the A2 claims, that defendants made several material misrepresentations of fact in their 2013 publicly filed 10Qs, and again in the company's April 16, 2014, 8K. As the Court knows, the 10Qs were admittedly materially deficient and had to be restated. The effect of that restatement resulted in a $137 million impairment charge that, when added to Mr. Najafi's $27 million in stock compensation, which he took in the third quarter of 2013, produced a staggering $173 million loss. Those facts, which were apparent to the defendants, or at least should have been apparent to the defendants, by the SEC's directive, by no later than the third quarter of 2013, went undisclosed until the company filed its restated 10Qs in its delinquent 2013 10K on September 10, 2014. With respect to their A3 claims, plaintiffs alleged the merger was a sham from the inception. It was designed only to provide to Mr. Najafi a public platform to sell his otherwise illiquid SkyMall shares and to retire operating debt owed to his affiliates through the sale of the company's only lucrative business lines, all while Mr. Najafi waited for the time he could finally cash in. In the end — Let me take your A2 claims first, all right? As I understand, and correct me if I'm wrong, if I've forgotten something, you've got four of these claims. One was the press release. That seems to be forward-looking and, therefore, comes under the safe harbor provisions of the Arizona Securities Act. Do you disagree with that? Well, one minor correction. The press release was part of our A3 claim. We are not alleging an independent misrepresentation in the press release as part of our A2 claims. But to address the Court's comments, we do disagree with that. The controlling case is the Omnicare case from the United States Supreme Court, and it says that if there are mixed statements of fact in forward-looking statements that affirm the speaker's belief, those can be used as a misrepresentation. All right. The second was a false statement as to the merger value, being originally stated at $25 million based on some economic analysis. And then I think the SEC said, no, you've got to value the merger based on the actual transaction, so it's $177 million. How is that a misleading statement to which a reasonable investor who is buying the security can object? I mean, he's buying it thinking it's worth $25 million and it turns out to be worth $177 million? Unless he's a short seller, he should be very happy. Your Honor, I recognize your question and why you would ask it, but let me address it in a few remarks in response. Number one, reliance is not an element under the Arizona Securities Act. But even if reliance isn't an element, how can any investor, whether he relied or didn't on this statement, be damaged by finding out that his investment is worth more than he thought it was? I mean, is capitalism revoked in Arizona? No, Your Honor. The second point I would make is that the impairment charge was masked by the understated value. So a reasonable investor would want to know that if a company is valued at a certain way, if it cannot sustain that, then it's going to have to take a massive impairment charge, which is what happened. So your statement is that the omission to state the impairment charge is the misstatement? It's one of them. Not the statement as to the valuation? Well, the valuation was incorrect. And under Arizona law, even an innocent misstatement can result in liability under the securities fraud statute. Even a favorable misstatement? If it's a misstatement, it suffices. This is really unusual legislation, isn't it? All right, go ahead. I want to get to the district court's ruling on the A2 claim. And let me start by picking up where I left off, is that under Arizona law all plaintiffs were required to allege was a material misrepresentation of fact, even an innocent one. And notwithstanding that defendants restated their financials, including their 10Qs, and plaintiffs' allegations detailing defendants' several other material misrepresentations and omissions, all of which, by the way, the district court seemed to accept as part of its ruling, it nonetheless dismissed plaintiffs' A2 claims with prejudice and without leave to amend, based upon an unbriefed and unsupported interpretation of Section 44 of 1991As in connection with language. Under the district court's interpretation, plaintiffs were required to, but failed to allege that the misrepresentations, quote, resulted in, end quote, the purchase of this exhibit securities. The district court's hearing in this respect was twofold. So it seems to me the boil down of your argument, and I know you want to go through the argument for me, but it seems to me what you're suggesting is that the district court's order requires that the plaintiff prove reliance, and you need not prove it. Isn't that where we are? That's precisely where we are, Your Honor. Okay. And Judge Bay has gone through two of the statements, the misleading statement, and I'll be fair. I thought that was an A2 claim, and if it isn't, then I'll put it in the other one. But then he went through the statements for omissions regarding the true merger value, and the next is the omissions regarding the elimination of the business lines and plans to sell SkyMall Ventures. Tell me why that makes it. Well, let me see if I can clarify. We alleged four primary misrepresentations as part of the A2 claim, or at least argued, and we can take up the allegations later. But the number one Judge Bay hit on was misrepresenting and failing to disclose the merger's true value. Right. And the adverse materiality of the higher valuation judge was that it created a substantial risk of an impairment charge because most of the additional consideration was allocated to goodwill. But we've gone through that. We've gone through that. So the second misrepresentation was failing to disclose the risk of the impairment charge, which is part and parcel with failing to disclose the merger's restated value. That's all under the first in my book. Well, go ahead. Fair enough. Elimination of the business lines and plan to sell SkyMall Ventures. I think that's really more in line with the A3 allegations, but I can go through the other A2 allegations, and we can turn to that one if you would like. The third series of misrepresentations in support of the A2 claim was filing a misleading April 16, 2014, 8K. Okay. I have that as my next, but I guess I'll move this out of the way. The A3 stated that there's no change expected to five accounts, i.e., the cash, debt, revenues, and cost of revenues, and that was accurate, but it only made or only told part of the story. It made no mention of what would be a forthcoming change in the goodwill account and a write-down of the goodwill through an impairment charge that would materialize once the required annual impairment Why doesn't this fall under the safe harbor provision, what they did about this 2014? Well, under the Arizona Securities Act, there's an affirmative duty not to mislead, and you can't just tell half the truth. All the reasons cited in the September 2014 delinquent 10K as the basis for the impairment charge had occurred in the second half of 2013. And so there's no reason in April of 2014 the company should not have then taken the impairment. The last misrepresentation for purposes of the A2 claim is failing to disclose the $27 million in stock compensation that was taken in the third quarter of 2013 but not ever disclosed until the delinquent September 10, 2014, 10K. And that was a significant expense. While the transaction itself was disclosed, and we concede that point, the effect of the transaction was not disclosed, and the effect of the transaction more than tripled the company's net operating loss expenses in 2013 from, I think, roughly $12 million to about $39 million. Those are the A2 claims. If I can turn now to the allegations in support of the A3 claims, the district court's dismissal of the A3. Well, frankly, it seemed to me that the district court took the A3 claims and said, this is just a recitation of the statute itself and dismissed it, right? Precisely, Judge. And it did that based upon its ruling of or its reading of Red River from the Arizona district court. And as we know, the Supreme Court later came out in SEC versus Lorenzo and pretty much did away with the arguments that the defendants made and the district court accepted, namely that Rule 10b-5's separate subsections do overlap and do not govern separate spheres of conduct. All right. Do you do additional misconduct beyond the statements or omissions sufficient to support your A3 claim? Yes, Your Honor, and I'd love to go through those if I may. Why don't you hit one or two of those? Because I think that's what they've got to respond to, because that's what the district court says you don't have. Correct. The district court eliminated its analysis to just paragraph 96 of the first amendment complaint. And let me go through kind of what the allegations are or what the arguments are. As I mentioned earlier, we alleged that the merger was a ploy from its inception, intended to create the appearance of two companies joining forces to strengthen themselves and to grow together. But as the chronology bears out, Mr. Najafi never had any intention of growing the companies. Instead, he used the appearance of the merger as a prop to gain control of Exhibit, to create a public market for his private SkyMall shares, and to wind up SkyMall's affairs as a means to pay off SkyMall's operating debt. Debt, by the way, which Mr. Najafi's affiliates had guaranteed to allow the company to stay operating while he waited for the time where he could finally cash in. So if we look at the paragraph at ER 471, have we laid out all of those which you're now to talk about, which say the merger itself, Najafi's course of conduct in terminating Exhibit's business lines, the delay in filing SEC Form 10-K and Form 8-K, and the undisclosed negotiation for the sale of the Exhibit's loyalty business? Are those what you're really going to discuss? Just one moment, if I may read that. I think that's it in a nutshell, Your Honor. Yes. All right. The last issue I'd like to discuss is the denial of leave to amend. As Your Honors know, and will probably hear, that plaintiffs initially pled that the defendants overvalued the merger, and candidly we did not plead the First Amendment complaint as well as we probably could have today or could do today. But that said, the arguments we raised below all derive from the same SEC filings that the defendants appended to their motion. And while there were ---- The district court said they've already amended it once. Why do I have to give them another shot? We did amend, Your Honor, to add the A-2 claims, but there was never any disclosure of any pleading defects, and so we've never had a chance to cure any pleading defects. It just said you already amended and ---- You know that the standard of review on a motion to amend is all abuse of discretion. Now, we realize the district court is supposed to give these amendments freely and all that stuff. But given abuse of discretion, I'm kind of got my hands tied behind my back. It's got to be something that's so out of it that there's no question that that's an abuse. And if you've given one chance to amend before, why is it that I've got to say now the district court was just abused its discretion in not allowing another one? Well, number one, the court denied leave to amend on futility grounds, and it never made any findings to support its futility conclusion. Number two, when the district court denied leave to amend, it did so without raising ---- without giving us any opportunity to cure the defects. There's no prejudice that was argued below as to why we shouldn't be given leave to amend. And, you know, the ruling on denying leave to amend is an abuse of discretion when, if the court's rulings are you simply failed to plead the in connection with requirement, or you simply failed to plead more than paragraph 96 in support of your A3 claim, then we should have been granted leave to amend. I see that my time is running short. All right. Thank you very much. Thank you. Morning, Your Honors. Lauren Stein, may it please the Court, Lauren Stein, appearing on behalf of the defendants, appellees. Unless the Court would like me to begin with a specific topic, I'll start where the last argument left off, leave to amend. Judge, as you correctly noted, the standard under this situation is abuse of discretion. And in this case, Judge Logan did not abuse his discretion in denying leave to amend. What factors should Judge Logan consider when he's trying to determine whether to allow amendment? Well, in this instance, Your Honor, based on Judge Logan's scheduling and standing order, which is now codified in local rule 12.1, there's a built-in opportunity for plaintiffs to amend. In this instance, the parties were required by virtue of the local rule and Judge Logan was required to confer in advance of any motion practice. The parties in this case had a robust discussion. But he didn't say anything about that. He did not, but it's required under his standing order. But I'm just trying to say, what were the factors he should have considered? He considered one, futility. He did not consider bad faith. He did not consider undue delay. He did not consider prejudice. He did not consider whether they'd previously amended, only to say they'd previously amended. And they're allowed that under the rule without his permission. So I'm trying to figure out, how do I support him when he doesn't give me all the factors? Your Honor, I don't know that he needs to go through a recitation of all of the factors. Why doesn't he? Your Honor, it's in his discretion. Well, frankly, the motion is in his discretion. But the factors he ought to consider so that I know whether to support him or not are not in his discretion. They're in rules I set down. Well, I didn't. Somebody above me, Baya or otherwise, or probably Judge Fernandez, put in law before that. Why doesn't he need to consider them? Well, and he may have, Your Honor, but in this instance, what he talked about was futility. And we know it's futile because there was an opportunity in this instance, when you go through the chronology of what happened, the parties had a meet-and-confirm in which they discussed the deficiencies in the complaint. That was the opportunity with which the plaintiffs had the ability to go and correct the deficiencies that were identified by the defendants. They opted not to do that. They then had the opportunity, after the defendants filed a motion to dismiss, to seek leave to amend at that point. But they didn't. They simply included a four- or five-word request leave to amend notation at the end of their briefing. They haven't demonstrated, and they didn't demonstrate, either at the trial court level or even on appeal, what facts or theories they would have pled in the complaint had they been given an additional opportunity. That's all futility. Yes, Your Honor. I believe so. It doesn't have anything to do with bad faith, and I frankly don't see any in this record. It doesn't have anything to do with undue delay, and I don't see any in this record. It doesn't have anything to do with prejudice to you, and I don't see any in this case. So I'm saying to myself, you know, I don't know whether I can go with that. And, Your Honor, I'm not arguing that those factors are present in this case. But under this circumstance, the futility prong allows you to affirm his ruling, particularly given that it's an abuse of discretion standard. This is very similar to a decision in the Taylor case, which another panel in this circuit affirmed. Under very similar circumstances, when you had this built-in local rule, which gave the parties effectively one opportunity to amend in advance, given an awareness of their the defects in their allegations. Your Honors, would you like me to address A-3 or the A-2 claims next? I think you should go A-2 and then A-3. Fair enough, Your Honor. The plaintiffs were required to plead to state an A-2 claim, a false representation or material omission, and it was material. Material meaning there was a substantial likelihood that the alleged misstated fact or omission would have significantly altered the total mix of information available to a reasonable investor. None of the arguments that they've articulated, either in the First Amendment complaint or those in the briefing process, have satisfied either the falsity or the materiality standard. Now, looking first to the merger, the allegation that the merger itself was somehow false, the valuation of it. But it isn't what the district court said. The district court said none of the allegations relate to actions taken by defendants in connection with the sale or purchase of securities, which suggests that the district court thought somehow reliance was important. I disagree, Your Honor. The in-connection language that Judge Logan referred to is on the face of the statute itself. It's embedded in a subsection 1991 claim. Surely, plaintiffs must acknowledge that language must mean something, that the alleged statement or omission must occur in connection with. And it's a fair reading, I think, of Judge Logan's order to say that what he concluded was none of the individual defendants in this action made a false statement or omission that was material in connection with the purchase and sale of securities. Would the purchase and sale by these plaintiffs of the securities or would the purchase and sale by a reasonable investor? Well, a reasonable investor, Your Honor, I think, goes to materiality, whether or not the alleged misstatement was material. Under Arizona's statutory scheme, in order to state a private cause of action against an individual, you need to examine ARS 44-2003, which states that if you're going to make a claim against, a private claim against an individual, that the alleged action must, the alleged individual must make, participate, or otherwise induce in the alleged sale of the security. I think in this instance, none of the facts alleged in the complaint or in the briefing process satisfy that standard. Your Honor, regardless of whether you agree or you disagree, though, with Judge Logan's in-connection with language, you can affirm on other grounds. You can look at each of the alleged false statements or alleged omissions, which form the basis of the claim, and conclude either or both that they were not false or not material. Why would we do that? Why wouldn't we send it back to him and let him do it? Your Honor, you can because all of the arguments and the facts are presented. We can, but why would we? You should in this case, well, for purposes of judicial economy, for one. But also, Your Honor, because in this instance, you haven't heard anything that's going to change going down below. And this Court does from time to time. And this is one of those, I don't want to call it unique, but perhaps less frequent situations where the Court can affirm based on any other grounds that are set forth in the pleadings. Now, if you'd like me to examine the individual alleged misstatements or omissions, I'm happy to do that, Your Honors. I think you'd better. Okay. Thank you. With respect to the alleged valuation of the merger, there's nothing false or misleading with respect to the alleged valuation. When you look at what was disclosed, in the fall 2013, the August 2013 SEC filings, Exhibit disclosed the following. First, that it had hired an independent valuation firm to value the merger. Second, that it could have reported the value on a market valuation methodology, which is the methodology that was ultimately encouraged by the SEC. But what Exhibit disclosed in those filings was that, based on the advice of the independent valuation firm, it didn't believe that that valuation was appropriate. It went with a $25.5 million valuation. So there's no lack of disclosure with respect to the facts. There was no lack of disclosure with respect to what a market valuation may have been versus what the ultimate valuation was that they had. And the fact that the SEC later disagreed with the manner in which the merger was valued doesn't constitute fraud. There's multiple different ways to value a company. This is really a disagreement, ultimately, over what constitutes, over what was a judgment call. And so in that instance, given that and the total mix of information available, it's not actionable. Second, there are allegations with respect to, I believe, the 8K, the April of 2014 8K. There's nothing false or misleading with respect to the statements in that 8K. If you look at ER 320, which is where the representation is, it states, we're currently assessing how the $125 million in additional fair value should be recorded. It's a disclosure of the $125 million, $152 million, and that it's going to be recorded. But they went further and stated, we don't believe the restatement will cause any changes to the previously reported cash, debt, revenues, cost of revenues, and so on. But coupled with that, Exhibit Disclosed don't rely on this. They disclosed, we are in the process of evaluating all of this information and how it is going to affect. You're suggesting it's under the safe harbor rule? I think you could conclude it's done under the safe harbor, or you could conclude, number one, it's not false because it's entirely truthful. And number two, it wasn't material in the total mix of information that was available in the marketplace at the time, particularly when in that very same statement, Exhibit Disclosed, you shouldn't rely on the 2013 filings. The SEC has asked us to look at how we valued the merger, and we're in the process of that. And not only that, they disclosed that they weren't sure when they would be able to, when that analysis would be completed and when they would be able to submit either amended or subsequent filings. So given the total mix of information available, Your Honor, it simply wasn't material. I believe I've hit all of the bases of the A2 claims, Your Honor, unless there's another one. What about the representation that there were some step plans to make a sale of unprofitable lines, right? Your Honor, and whether that's But they didn't say anything about selling the one profitable line, SkyMall Ventures, which was sold, right? So wasn't that a material omission? No, Your Honor. And I'm going to take that in two parts, because I think that that allegation has two components to it. First of all, there's the allegation that there wasn't a disclosure of the discontinuation of the nutraceutical line, which occurred in the fall of 2013. That was, in fact, disclosed. If you look at ER 291 and 305, it was disclosed in the November 2013 10Q. So there's no lack of disclosure on those grounds. With respect to the ultimate sale of the Ventures line of business, that didn't occur until September of 2014. It was September 10th of 2014, to be exact, and it was disclosed the very day that it was consummated in an 8K filed with the SEC. And we know from the GM case, the Pan Am case, and the Taylor case, there's no negotiations to sell off a line of business. So there really, absent that duty to disclose, there isn't an omission here that's actionable. Well, but the representation was that the merger between Exhibit and SkyMall was going to benefit through the marketing expertise of Exhibit. And rather than benefit, the SkyMall Venture was sold. So those statements were made, Your Honor, in connection with the press release, which happened in May of 2013. Now, whether or not that's the 8-2 claim or the 8-3 claim, those statements are covered by the safe harbor rule, regardless of whether or not the safe harbor rule, because they're forward-looking statements and they were accompanied by cautionary language. That in and of themselves means that they're not. What isn't covered by a safe harbor forward-looking rule is an omission. And in that instance, Your Honor, if you look at the... I'm sorry, you have a question? Well, no. I mean, unless you have a case telling me that failing to say something is a forward-looking statement, which is a contradiction in terms. So when you look at the press release, the press release is made... What you're saying is that in May of 2013, they hadn't decided whether to sell SkyMall Ventures, and they didn't have to mention it, right? Exactly. Okay, fine. I got you. Under the same circumstances, you know, the way that the corporation works, the fact that, you know, plans don't turn out the way that the parties may want them to, that's not actionable fraud. Now, with respect to the 8-3 claim, I believe I've covered all of the press release statements. There's been an argument, and we've covered the venture sale as well. Plaintiffs have also alleged that the merger itself was a scheme to pay off loans to defendant Najafi's entities. We've demonstrated that there were no loans to Mr. Najafi's entities or any of his affiliates at the time of the merger. None of that happened until later, until the fall of 2014, when Mr. Najafi's entities loaned money to infuse cash into the business, which was necessary to keep it going as a going concern through the end of the year. The pre-merger loans were not secured by Mr. Najafi's entities. That was a chase loan, and it was secured by Exhibit. And you can see that at page ER-123, which is the May 22, 2013, 8-K, which discloses that it's Exhibit and it's Exhibit's subsidiaries, which are the guarantors. So there was no factual misstatement. There was no omission. There was no actionable conduct in connection with that allegation. Your Honors, unless there's anything additionally you'd like me to address. I think we have your points. Thank you. We have your points. Just a few quick brief points, if I may. In that whole discussion on Rule A-3, I'm brought back to the fact that we're here under Rule 12b-6. And a lot of this back and forth on the timeline or what was disclosed or what was not disclosed, we're getting into fact issues. And I would submit that the allegations are what really should control. My colleague submitted a Rule 28-J letter on the Taylor case. The gist of that decision was that the plaintiffs knew of certain pleading defects and still then chose not to amend. That's certainly not the case here. On the issue of the merger valuation, the argument that the reported value was not misleading ignores the significance of the $137 million impairment charge, which resulted in a dollar-for-dollar charge to the company's income, producing a cumulative $173 million loss for 2013. When the company restated its second and third quarter 10Qs in September of 2014 to reflect the true value of the merger, its goodwill went up from $15 million to $141 million. Assuming those figures were reported back in 2013 as the company conceded they should have been, the SEC didn't just come in and say, this is the value. Exhibit agreed to what the value was. But going back to the point, if all of that had been reported back in 2013, Exhibit, per its own impairment policy, would have then been duty-bound to reassess its goodwill that it was carrying on its books, and that was impaired. And a lot of this probably comes to light much faster than it really did. With respect to the April 16, 2014, SEC Form 8K, defendants failed to disclose the whole truth. They did say that the merger had to be restated. They did list the accounts that it would not affect, but they did not list the non-current intangible accounts that the company's goodwill would be allocated to and impaired. Last, the merger was praised in a press release, and my good friend here quoted the 10Qs saying, well, we disclosed the nutraceutical line was going to be terminated in 2013. That's true, but you have to look at that in light of what they were also saying in 2013 10Q, which was, we're going to grow. We're going to start reporting profits. We're positioning ourselves to expand. What they were really doing was cutting back everything. The research, for example, in the internet segment marketing was shut down in December of 2013. So they're really telling two stories. All right, thank you very much. Thank you very much. The case of McCauley and Kendler v. Najafi is submitted, and the court will stand in recess until 9 o'clock tomorrow morning. All rise.
judges: Fernandez, Bea, N.R. Smith